IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

LISA DARLENE BAIN             )
                                       )
v.                               )     No. 2:14-0005
                                       )     Judge Sharp/Bryant
SOCIAL SECURITY ADMINISTRATION     )

To:     The Honorable Kevin Sharp, Chief Judge

## <u>REPORT AND RECOMMENDATION</u>

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's applications for disability insurance benefits and supplemental security income, as provided under Titles II and XVI of the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 11), to which defendant has responded (Docket Entry No. 13). Plaintiff has further filed a reply in support of her motion. (Docket Entry No. 14) Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 9),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be GRANTED and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report, to include an award of benefits.

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

# I. Introduction

Plaintiff filed her applications for benefits on July 27, 2010, alleging disability onset as of July 25, 2010, due to heart attack, chronic obstructive pulmonary disease (COPD), emphysema, and high blood pressure. (Tr. 163, 167) Her applications were denied at the initial and reconsideration stages of state agency review. Plaintiff subsequently requested *de novo* review of her case by an Administrative Law Judge (ALJ). The case came to be heard by the ALJ on June 8, 2012, when plaintiff appeared with counsel and gave testimony. (Tr. 65-93) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the ALJ took the matter under advisement until August 28, 2012, when he issued a written decision finding plaintiff not disabled. (Tr. 39-50) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.

2. The claimant has not engaged in substantial gainful activity since July 25, 2010, her alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: history of myocardial infarction with catheterization and stenting, hypertension, chronic obstructive pulmonary disease, obesity, anxiety and depression disorders (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with limitations. She can

occasionally interact with supervisors, coworkers and the public. She can have slight exposure to environmental irritants such as dusts, fumes, gases, odors, and temperature extremes.

6.    The claimant is capable of performing her past relevant work as a housekeeper/cleaner. This work does not require the performance of work related activities precluded by her residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from July 25, 2010, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 41, 43, 48, 50)

On November 20, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

Neither party to this action endeavored to summarize the 350-page medical record in this case, but simply referred to it as necessary to support their arguments. The undersigned will follow the same tack. The ALJ offered the following summary of plaintiff's testimony regarding her impairments:

The claimant alleges she is unable to work because of numerous physical and mental impairments including heart and hypertension problems, severe breathing difficulties, obesity, anxiety and depression. She alleges she had a heart attack in July 2010 that continues to cause her chest pain and problems. She also alleges she suffers from severe hypertension that is not controlled by

her medications, which causes her to suffer from throbbing headaches, dizziness, and blurred vision. She further alleges she suffers from severe chronic obstructive pulmonary disease that has severely affect[ed] her breathing for well over a year. She alleges this impairment causes her to gasp for air, breathe loudly, and makes it extremely difficult for her to talk and sleep. She goes on to allege she is obese, which aggravates her heart and breathing problems and makes them worse. She alleges her physical problems cause her to be extremely tired, weak, fatigued, and exhausted all of the time, and severely limit her ability to lift, carry, reach, sit, stand, walk, bend, squat, kneel, and climb. She finally alleges she suffers from anxiety and depression. She alleges these impairments cause her to be sad and down at times and very anxious at others, that they make it hard for her to concentrate and remember things, and cause her to have panic attacks when she gets around crowds.

(Tr. 43)


## III. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the record contains substantial evidence that could have supported an opposite conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir. 2005). Accordingly, while this court considers the record as a whole in determining whether

4

the SSA's decision is substantially supported, it may not review the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007); Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. at § 423(d)(3).  In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations.  Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C.  Plaintiff's Statement of Errors

The bulk of plaintiff's legal arguments go to the ALJ's analysis of her RFC and the resulting finding that she is physically able to either return to her past relevant work, or, alternatively, to perform other jobs existing in significant numbers in the economy. Amid these arguments concerning findings at later steps of the sequential evaluation process, plaintiff inserts her contention that the case should have been decided at step three of the process, inasmuch as the criteria of Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders) are satisfied. (Docket Entry No. 12 at 16-18) However, aside from reciting the criteria of those listings, plaintiff does not demonstrate how those criteria are established in the record evidence, but instead focuses on the alleged defects in the ALJ's weighing of the mental health evidence during the determination of plaintiff's RFC. Especially with the argument thus framed, the undersigned finds no reason to disturb the ALJ's finding that the criteria of Listings 12.04 and 12.06 are not met or medically equaled in this case. (Tr. 41-42)

Turning to the heart of plaintiff's appeal, it is argued that the ALJ erred in determining that she had the RFC to perform light work which allows for slight exposure to environmental irritants and temperature extremes, and was therefore able to return to her past relevant work as a housekeeper/cleaner. Plaintiff argues that the opinion of her treating physician, Dr. Jack Rhody, should have been accorded controlling weight, as it was well supported by the clinical and laboratory findings in evidence and not inconsistent with other substantial evidence of record. She argues that the ALJ's decision to instead adopt the assessments of the nonexamining state agency consultants was contrary to the governing regulations. She further argues that a number of findings which formed the underpinning of

the ALJ's credibility determination were simply erroneous and unsupported by the evidence. A review of the ALJ's narrative decision reveals that several key findings do indeed suffer from lack of substantial evidentiary support, as explained below.

In terms of the opinion evidence, the ALJ's weighing of the assessments of Dr. Rhody, Dr. Blevins (the first consultative examiner), Dr. Keown (the second consultative examiner), and Drs. Pennington and Cylus (the nonexamining state agency consultants) is set out below:

> As far as the opinion evidence regarding the claimant's ability to function physically is concerned, the undersigned has considered the opinion[] of Frank Pennington, M.D., who reviewed the evidence and performed a Physical Residual Functional Capacity Assessment[] on the claimant at the State agency's request.  Dr. Pennington diagnosed the claimant with a history of heart problems, hypertension, and chronic obstructive pulmonary disease.  He opined that she is capable of performing the light range work, but should avoid concentrated exposure to pulmonary irritants such as dusts, odors, fumes, gases, poorly ventilated areas, and temperature extremes.  Lewis Cylus, M.D., who also reviewed the evidence, concurs with Dr. Pennington's opinions and affirms the same.  The undersigned gives great weight to Dr. Pennington's and Dr. Cylus' opinions since they are consistent with, and supported by, the overall weight of the evidence in the record.

> The undersigned has also considered the opinions of Dr. Keown that were previously set out above, and gives them less weight since they are too optimistic and somewhat inconsistent with the evidence in the record.

> The undersigned has further considered the opinions of Melvin Blevins, M.D., who also performed a consultative physical examination at the State agency's request, and gives them even less weight since they are too restrictive in light of the overall weight of the evidence in the record.

> The undersigned has finally considered the treating medical source statement of Dr. Rhody, who opines the claimant is unable to perform even the full

> range of sedentary work. The undersigned gives no weight to Dr. Rhody's
> opinions since they are inconsistent with his own records, and the overall
> weight of the evidence in the record.

(Tr. 47-48) These conclusions hearken back to the ALJ's discussion of the evidence related to

each of plaintiff's physical impairments, as well as the other factors which informed his

credibility determination. It is not for this Court to re-weigh the evidence or decide

questions of credibility. See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007); Garner v.

Heckler, 745 F.2d 383, 387 (6th Cir. 1984). However, while an ALJ's credibility

determination is due significant deference on judicial review, that determination must

nonetheless be reasonable and supported by substantial evidence if it is to be affirmed.

Rogers v. Comm'r of Soc. Sec., 486 F.3d at 247-49. Thus, "[w]hether the ALJ permissibly

found [plaintiff's] complaints not credible depends not only upon the scope of his authority

in making such credibility determinations, but also upon his evaluation of the evidence on

which the determinations were made." Id. at 247.

      Here, the ALJ evaluated the evidence of each severe impairment to determine

whether plaintiff's complaints related to that impairment were credible. With regard to

plaintiff's cardiac impairments, the ALJ found as follows:

> The evidence establishes that the claimant suffered a heart attack and
> underwent cardio-catheterization and stent placement on July 25, 2010 as she
> alleges. However, it also reveals she made an excellent recovery and has had
> few problems, and required little treatment for this impairment since then.
> Medical records reveal she has rarely complained of heart related chest pain,
> and that the pain she did occasionally mention was mild in nature. Multiple
> physical examinations reveal the claimant's heart rhythm, rate and sounds are
> normal, with no evidence of bradycardia, tachycardia or murmurs. The
> evidence also reveals the claimant's hypertension is not as bad as she alleges
> either. Medical records from her primary care physician reveal her blood

9

pressure readings were only 136/80 as recently as May 14, 2012, and 120/56 on June 19, 2012.[2] While the claimant['s] blood pressure has been noted to be elevated at times, it is usually because she was not taking her medications as directed. The evidence does not document the severe headaches and vision problems the claimant alleges, or establish she has suffered any end-organ damage because of the same. It also does not establish that her heart and hypertension impairments severely limit her ability to function in any way.

(Tr. 44)

To begin with, while plaintiff has not suffered more than the one heart attack, and has had multiple stethoscope examinations which did not reveal any abnormalities, it does not appear as though her heart functioning was returned to normal as a result of the stent placement. Both Dr. Rhody and Dr. Blevins began the list of plaintiff's impairments which informed their functional assessments of her with "[s]tatus post myocardial infarction" (Tr. 605) and "ASHD [(arteriosclerotic heart disease)] with history of MI" (Tr. 362), respectively. Both Dr. Blevins and Dr. Keown appreciated some abnormality upon their examinations of plaintiff, Dr. Blevins noting "[b]orderline sinus tachycardia with occasional APCs and intermittent S3 gallop" (Tr. 361), and Dr. Keown noting "[t]achycardic rate." (Tr. 614) Moreover, electrocardiogram (EKG) results were predictably highly abnormal at the time of plaintiff's heart attack in July 2010 (Tr. 417), then improved to only showing the abnormality of a non-specific T-wave at the time of her April 2011 hospitalization (Tr. 394, 397), but showed multiple new abnormalities by the time of her October 2011 hospitalization. (Tr. 531) In short, it is clear from the medical evidence that plaintiff's heart

_____

[2]In fact, plaintiff's blood pressure on this date was 130/72. The ALJ mistakenly reproduced numbers from the reference range, rather than the actual readings of plaintiff's systolic and diastolic blood pressure. (Tr. 610)

disease continues to cause her problems, and is not simply of historical value in describing her current condition.

Moreover, it simply cannot be said that plaintiff's blood pressure was noted to be elevated "at times." The record is replete with references to extremely high blood pressure readings, such that the recorded instances of readings in the normal range are significantly in the minority. Indeed, plaintiff has been diagnosed with "accelerated" or "malignant" hypertension (Tr. 300, 423, 465, 467, 529, 532, 610) requiring intravenous medications to control, with readings as high as 261/122. (Tr. 531) There is evidence of her longstanding difficulty with achieving control of her hypertension with single prescriptions. (E.g., Tr. 280) Upon her presentation to Cookeville Regional Medical Center on January 25, 2010 (her alleged onset date) with severe hypertension and chest pain, cardiologist Robert Case, M.D., diagnosed her with a "[h]ypertensive emergency," "[l]ong-standing hypertension with poor control," and "[a]cute systolic congestive heart failure with severe left ventricular dysfunction." (Tr. 331) His treatment plan included the following: "A long discussion with the patient and her husband about a multi-issue approach to control of her hypertension, both acutely and chronically. Will wean IV nitro and try to start an appropriate oral regimen for the patient's blood pressure control. I explained that at [least] four medications will be needed to control the patient's blood pressure." (Tr. 332) In the report of plaintiff's cardiac catheterization on July 28, 2010, Dr. Case noted that the procedure was indicated due to, e.g., "[s]evere hypertension, refractory to multiple antihypertensive medications." (Tr. 334) Plaintiff's discharge summary from this hospitalization reflects that "[s]he was treated for congestive heart failure with diuresis and her blood pressure medicines were titrated with adequate blood pressure control on four-five medications." (Tr. 327) She was

discharged with prescriptions for the antihypertensives Lisinopril, Coreg, Spironolactone, and Amlodipine. (Tr. 328)

On October 31, 2011, plaintiff was again admitted to the hospital after presenting to the emergency room with a blood pressure of 261/122. (Tr. 530-37) In the emergency room, she reported a throbbing headache, and a history of such headaches with elevated blood pressure. (Tr. 530) She also reported mild blurring of her vision, and a history of this symptom as well with elevated blood pressure. Id. The progress note reflects that plaintiff's case was discussed with Dr. Rhody, specifically the rationale of treating plaintiff's blood pressure with a nitroglycerin IV drip in view of her blood pressure of 261/122 and a headache that did not respond to IV Labetalol. (Tr. 532) Plaintiff was diagnosed with accelerated hypertension (Tr. 533), and was also noted to be in renal failure. (Tr. 534) Thus, the evidence does not appear to confirm the ALJ's assertion that plaintiff's hypertension has been successfully treated without significant consequences. While hypertension may not be the sole cause of any exertional limitations, it clearly was a factor in Dr. Rhody's assessment of same. (Tr. 605)

Lastly, with regard to the ALJ's statement that plaintiff's elevated blood pressure readings are "usually because she was not taking her medications as directed" (Tr. 44), there is no citation in support of this assertion, nor is the undersigned able to find any instances in the record where her medication compliance was questioned by any treating source. Plaintiff herself has noted that she keeps her medications separated out into a daily planner container (Tr. 210), and otherwise gives no indication that she fails to renew prescriptions or misses doses, intentionally or otherwise. Indeed, the only instance of such

12

questioning that is apparent to the undersigned is within the consultative examination report of Dr. Keown.  (Tr. 612-20)  Dr. Keown made the following observations in discussing plaintiff's hypertension:

> The claimant's blood pressure is elevated.  She states her blood pressure [has] never been adequately controlled.  She was hospitalized for hypertension in October 2011.  She presents today with multiple antihypertensive medications including carvedilol, Norvasc and lisinopril.  These medications were filled on May 30, 2012.  The carvedilol container is full, Norvasc an estimated 15 tablets remaining and lisinopril container is full.  When confronted, she states that she has allegedly been taking samples of medications instead.  She says she has been getting samples from a friend of hers for these very same medications.  On initial presentation today, her blood pressure is 200/140; after periods of rest, re-examined 190/120.  She maintains that she has been compliant with all of her medications.

(Tr. 612)  Dr. Keown diagnosed "[h]ypertension, very poorly controlled, suspect medical noncompliance" (Tr. 614), and qualified her assessment of plaintiff's exertional abilities by noting that "given compliance with prescribed medications, cl. capable to perform as listed." (Tr. 615)  Plaintiff vigorously disputes the notion that she is less than fully compliant with her prescriptions, testifying that in view of her lack of insurance, she indeed sought to save her purchased medications in the instance noted by Dr. Keown by obtaining samples from her physician on May 22, 2012, and by taking the unused portion of her sister-in-law's Spironolact prescription when the sister-in-law's physician changed her prescription to a new medication.  (Tr. 239-41)

The ALJ did not find this explanation to be credible, citing the relatively sparse record of recent treatment for her allegedly severe medical problems, as well as other factors bearing on her credibility.  (Tr. 45)  However, while there are only two notes of

treatment from Dr. Rhody in 2012, the doctor did report in his medical source statement that he was also her husband's treating physician and that he had treated her on occasion at her husband's appointments "without charting the visit." (Tr. 608)  Among the other factors which the ALJ noted to reflect poorly on plaintiff's credibility is the fact that, while she was uninsured and alleged an inability to pay for the treatment she needs, she nonetheless "sought treatment for such innocuous things as insect bites during the period in question." (Tr. 44)  The ALJ noted that "[i]f she obtained treatment for such a minor thing as that, it stands to reason she would certainly seek treatment for the severe and disabling impairments she alleges, if she in fact needed to do so."  (Tr. 44-45)  However, the ALJ neglects to mention that the insect bite in question had become infected, requiring a procedure involving incision of the abscess and drainage of pus, as well as prescription of the narcotic painkiller Lorcet.  (Tr. 541)  Furthermore, among the inconsistencies identified by the ALJ as damaging plaintiff's credibility is her testimony that she helps care for her disabled husband, when she advised the state agency that she did not do so.  (Tr. 47)  It is unclear what testimony the ALJ refers to here, as plaintiff clearly testified at her hearing that she does not help take care of her  husband (Tr. 73), and stated in an agency questionnaire that her daughter-in-law and son help with the care of her disabled husband.  (Tr. 209)  Also, the ALJ notes that plaintiff "testified she quit smoking in April 2011, but advised one of her medical providers she was continuing to smoke at least a pack a day on October 31, 2011."  (Tr. 47)  However, this reference appears to have been mistakenly included in the "Social History" field of the emergency room physician's report that day (Tr. 530), inasmuch as the triage nurse's report had described plaintiff as a nonsmoker (Tr. 534) who had stopped using tobacco in April 2011.  (Tr. 537)  Finally, the ALJ noted an inconsistency between plaintiff's

allegations of disabling impairments and her activities of daily living:

> The evidence reveals the claimant cares for all of her own personal needs, and [] some of her disabled husband's as well. She also cleans, washes dishes, does laundry, prepares simple meals, cooks, pays bills, counts change, uses a checkbook and money orders, watches television, drives, shops, and visits with others.

(Tr. 47) The ALJ cites plaintiff's hearing testimony and her responses to an agency questionnaire as supporting this finding regarding her daily activities. However, review of both sources reveals that the ALJ vastly overstates plaintiff's level of daily activity. As previously mentioned, there is no indication that plaintiff provides any significant level of daily care for her husband. Although she prepares her own meals, plaintiff stated in response to the agency questionnaire that those meals include "[s]andwiches, cereal, cans of soup and frozen meals," as she "cannot cook large meals anymore." (Tr. 210) As for cleaning, washing dishes and doing laundry, plaintiff reported that she could "wash a few dishes" on a daily basis for a duration of about five minutes; that she could fold laundry about once a week, spending about 20 minutes at this activity; and that the major cleaning, vacuuming, and dusting was done by her daughter-in-law. Id. She further revealed that she only drives short distances, that her daughter-in-law does the grocery shopping, and that she only shops in stores for personal items "maybe once a month for about ten minutes." (Tr. 211) As for visiting with others, plaintiff reported that the "others" with whom she had multiple visits a week were her son and daughter-in-law, who always came to visit her. (Tr. 212) Plaintiff's hearing testimony does not reveal any further range of daily activity than she revealed in response to the agency questionnaire.

Turning to the ALJ's evaluation of plaintiff's respiratory illness, he found that

15

"[t]he evidence does not document the inordinate gasping for breath, loud breathing, difficulty talking, weakness, and fatigue the claimant alleges she has because of this impairment." (Tr. 44)  At plaintiff's hearing before the ALJ, much was made by the ALJ about the "extremely audible, loud breathing, wheezing" that plaintiff displayed.  (Tr. 65)  He clearly had difficulty believing that this was a genuine presentation, noting that she arrived "in the hearing room with just terribly, terribly loud breathing" and asking if she always breathed "that noticeably loud" (Tr. 67) and if Dr. Rhody ever commented on "the loudness of your breathing" (Tr. 72).  After receiving testimony from plaintiff and the vocational expert, the ALJ invited a posthearing evidentiary submission from plaintiff's counsel, stating that "really I think it would be important for Dr. [Rhody] to say yes, every time this individual comes in ... her breathing remains markedly audible throughout[,] even after she's made the walk to the examining room and sat for 5/10/15/20 minutes, whatever." (Tr. 86)  He continued to emphasize to counsel that "right now I see this marked picture of your client, and I just -- I just look into the records.  Really I would think the providers would just say -- have really graphic descriptions, detailed, dramatic descriptions of what we're seeing here."  (Tr. 87)  One final time, the ALJ stated that it would be helpful to plaintiff's claim if Dr. Rhody could confirm that every time he saw plaintiff, she presented with "extremely loud breathing" (Tr. 89-90).

          While it is for the ALJ, and not this Court, to evaluate the credibility of witnesses appearing before him, "the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'"  Rogers, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).  Here, in judging plaintiff's presentation at the hearing against his expectation that plaintiff's loud breathing/wheezing

would be prominently noted in the treatment records if it were displayed to her treatment

providers, the ALJ minimizes the number of abnormal findings related to plaintiff's

breathing problems in the record. He focuses his attention on the recent instances where the

medical findings have reflected a less significant struggle with respiratory distress:

> Medical records reveal the claimant has only sought treatment for her
> breathing problems from her primary care physician, Jack Rhody, M.D., on
> two occasions since she was hospitalized for the same in October 2011. On
> May 14, 2012 she complained of wheezing and chest pain for the past three
> weeks. However, he observed no shortness of breath or wheezing and her
> physical examination revealed normal breathing and voice sounds, and no
> rales, crackles or rubs were noted. She was diagnosed with an upper
> respiratory infection and prescribed an antibiotic to treat the same. She was
> seen again on June 16, 2012, and complained of wheezing and a burning
> sensation in her chest at that time. However, no shortness of breath was
> observed on that occasion either, and her physical examination again revealed
> normal breath sounds, normal voice sounds, and no rhonchi, rales or crackles.
> The claimant's most recent pulmonary function test also reveals she has an
> FEV1 of 63%, and an FVC of 72%.[3] Multiple chest x-rays have also been
> interpreted as normal as well.

(Tr. 44) This snapshot ignores the fact that the record contains a multitude of instances of

wheezing, rhonchi, and other abnormal breath sounds being appreciated on examination;

other pulmonary function tests which confirm obstructive airway disease (Tr. 364-67, 445),

as well as one which does not (Tr. 348-49); and, multiple abnormal chest x-rays (Tr. 363, 411,

412). In 2011, plaintiff was hospitalized twice with acute exacerbations of her

asthma/COPD, once in April (after which she finally quit smoking cigarettes) and once in

---

[3]This description makes it sound as though these test results are normal. In fact, these results
produced the following findings: "The FVC, FEV1, FEV1/FVC ration and FEF25-75% are reduced
indicating airway obstruction. The slow vital capacity is reduced. Following administration of
bronchodilators, there is no significant response. ... Pulmonary Function Diagnosis: Moderate
Obstructive Airways Disease[.]" (Tr. 520)

October.  In both instances she was observed to be in significant respiratory distress, with findings such as fatigue, rhonchi, wheezing, prolonged expirations, accessory muscle use, decreased air movement, and speaking in single words or short phrases.  (Tr. 393-403, 530-34)  Plaintiff was also diagnosed with another acute exacerbation of COPD upon a visit to see Dr. Rhody in May 2011, when she presented with bilateral rhonchi/wheezing.  (Tr. 513)  Here again, as with his determination that plaintiff's hypertension symptoms are not as bad as she alleged, the ALJ finds that plaintiff's breathing problems "are fairly well controlled by her medications and inhalers, even though she does not always take or use them as directed."  (Tr. 44)  Other than Dr. Keown's conclusion on this point, the undersigned has found no evidence in the record to support the notion that plaintiff does not take her medications as prescribed.

Indeed, plaintiff testified that she takes additional treatment in the form of her husband's oxygen, which helps her.  (Tr. 75-76)  Just prior to being discharged from her April 2011 hospitalization, plaintiff's oxygen saturation had dipped to 87% on room air, so she was put back on 3 liters per minute of supplemental oxygen, which restored a normal saturation level; thereafter, she was discharged home with the notation that "patient states husband has [oxygen] prn at home, if feels [short of breath] will use (concerned over no ins[urance])."  (Tr. 403)  In his medical source statement, Dr. Rhody confirmed that "[t]his patient should be on oxygen, however, she is uninsured.  She tells me she uses her husband's oxygen daily, as well as his breathing treatments, to get some relief."  (Tr. 608)

Returning to the opinion evidence, the first assessment of plaintiff's work-related functional ability was rendered by the consultative examiner, Dr. Blevins, in January

2011 (Tr. 358-69). The ALJ summarily dismissed Dr. Blevins' opinion as "too restrictive in light of the overall weight of the evidence in the record" (Tr. 47-48), without any discussion of Dr. Blevins' findings or conclusions elsewhere in the decision. Dr. Blevins recorded plaintiff's blood pressure as 184/91, and noted that "fundoscopic exam shows grade 2 atherosclerotic changes" to the retinal vasculature. (Tr. 360) He further noted that plaintiff's "[b]reath sounds are decreased with scattered rhonchi and expiratory wheezing" and that she was dyspneic, or short of breath, at rest. (Tr. 361) He ordered a chest x-ray and pulmonary function tests to follow his examination of plaintiff. The chest x-ray was "[a]bnormal ... with evidence of COPD, pulmonary emphysema and significant interstitial changes suggesting reactive airway disease." (Tr. 363) The pulmonary function tests showed that plaintiff's best measurements of forced expiratory volume after one second ($FEV_1$) were 1.44 (55% of predicted) before the administration of the bronchodilator and 1.56 (60% of predicted) post-bronchodilation.[4] (Tr. 364, 366) These results informed Dr. Blevins' assessment that plaintiff could occasionally lift less than 20 pounds; could not engage in frequent lifting; could stand less than 2 hours per day; and, could sit less than 4 hours per day. (Tr. 362)

In February 2011, Dr. Pennington reviewed plaintiff's medical file and rendered the assessment to which the ALJ gave the greatest weight: that plaintiff could perform light work[5] that does not involve concentrated exposure to environmental irritants. (Tr. 370-78) Dr. Pennington largely based his assessment on Dr. Blevins' findings (Tr. 377),

_____

[4] $FEV_1$ is the test result which, in correlation with the patient's height, establishes listing-level pulmonary obstruction. See 20 C.F.R. Part 404, Subpt. P, App. 1, § 3.02.

[5] Light work requires lifting/carrying of up to 20 pounds occasionally and ten pounds frequently, and either a good deal of walking or standing, or prolonged sitting with some pushing/pulling of arm or leg controls. 20 C.F.R. § 404.1567(b).

though he disagreed with the limitations Dr. Blevins imposed because the evidence did not show that plaintiff used any assistive devices to walk, but displayed normal gait/station. (Tr. 376) However, in discussing salient findings from Dr. Blevins' testing, Dr. Pennington stated that pulmonary function testing showed "best FEV1=2.45 and FVC=2.66." (Tr. 377) That is incorrect. In fact, the best $FEV_1$ score reported was 1.56. (Tr. 364, 366) The result which Dr. Pennington reported was plaintiff's best $FEV_3$ score, which was 83% of predicted. (Tr. 364) When Dr. Pennington's assessment was reconsidered by a second nonexamining state agency consultant, Dr. Cylus, the following findings were reported:

> She continues to complain of SOB with minimal exertion in spite of PFT's at CE [(the consultative examination by Dr. Blevins)] which show FEV1 of 1.56 (60%) and FVC of 2.66 or 88% and with no overt signs of failure (though the only [ejection fraction] is 30%)[6]. Xray at CE was read as showing severe, chronic interstitial changes raising the possibility of a diffusion defect which was not tested for during PFT's. Suggest obtaining program compliant DLCO[7] before final adjudication of this case.

(Tr. 518) After additional testing was performed (Tr. 520), Dr. Cylus submitted the following addendum to his findings:

---

[6]In fact, plaintiff's ejection fraction was estimated at 25%. (Tr. 331) Low ejection fraction can cause shortness of breath. http://www.cpmc.org/services/heart/tx/ejectionfraction.html

[7]The DLCO test is performed as follows:

You breathe in (inhale) air containing a very small amount of a tracer gas, such as carbon monoxide. You hold your breath for 10 seconds, then rapidly blow it out (exhale). The exhaled gas is tested to determine how much of the tracer gas was absorbed during the breath.

https://www.nlm.nih.gov/medlineplus/ency/article/003854.htm

New PFT's are now available which show spirometry consistent with previous PFT's (FEV1 at 63% predicted and FVC of 72% predicted) but with note that despite good effort, there was not enough airflow to trigger the DLCO. This statement appears incompatible with the spirometry reports which were produced[.]

(Tr. 527) The additional test results confirm that the DLCO test was attempted "several times," but plaintiff could not generate the airflow to trigger a reading. (Tr. 520) Dr. Cylus determined that without this data, the medical evidence of record was insufficient to establish a gas exchange dysfunction, and accordingly confirmed the earlier assessment of Dr. Pennington. (Tr. 527)

On June 5, 2012, treating physician Dr. Rhody opined that plaintiff could occasionally lift/carry 10 to 15 pounds; could not perform frequent lifting; could stand/walk less than 2 hours per day; and, could sit about 4 hours per day. (Tr. 605-06) He further opined that she could only rarely engage in most postural activities, and that she should avoid working around heights or moving machinery, vibration, and temperature extremes. (Tr. 607-08) He also stated that "[d]ust, fumes and chemicals should be avoided due to her severely compromised breathing." (Tr. 608) In conclusion, Dr. Rhody stated as follows:

I have been treating this patient since 2000. However, since she is not insured, she [is] unable to get the treatment she needs. I am also her husband's treating physician and on occasion I have seen her at his appointments without charting the visit. She has been hospitalized many times for her heart and lung conditions.

Id.

Against this backdrop, after hearing the case on June 8, 2012, the ALJ sent plaintiff to one more consultative examination. Dr. Keown's June 29, 2012 examination

revealed that plaintiff had elevated blood pressure (190/120), a tachycardic heart rate, and was short of air. (Tr. 613-14) Describing plaintiff's lungs, Dr. Keown noted "use of accessory muscles to respire. Rhonchi and wheezing throughout." (Tr. 613) However, Dr. Keown suspected plaintiff's noncompliance with prescribed treatment, and rendered a functional assessment that represented her expectation of plaintiff's abilities "given compliance with prescribed medications[.]" (Tr. 615) She did not render an assessment based on the history and physical examination results that were obtained in her office.

In short, the undersigned finds that the ALJ's conclusion, based on Dr. Keown's report on the content of plaintiff's pill bottles (Tr. 613), that plaintiff is not compliant with her prescribed treatment (Tr. 45) is not supported by substantial evidence. Even if plaintiff had not offered a plausible explanation for why her pill bottles remained full or near full when examined in Dr. Keown's office, this one item of circumstantial evidence is set against the vast weight of the remaining medical record. Neither the government in its brief, nor the undersigned in his review, has identified any other instance in the record where plaintiff was suspected of or confessed to not taking her medications. Dr. Keown's assessment of plaintiff's functioning is therefore unreliable, and indeed was otherwise discounted by the ALJ as "too optimistic and somewhat inconsistent with the evidence in the record." (Tr. 47)

This leaves the opinions of two examining physicians, Drs. Rhody and Blevins, that plaintiff could not perform full-time work, and the opinions of two nonexamining physicians, Drs. Pennington and Cylus, that plaintiff could perform full-time work. In particular, the examiners are in agreement that plaintiff can stand/walk for less than two

hours out of an eight-hour day and that she can sit for no more than four hours, while the non-examiners agree that plaintiff could be expected to stand/walk and sit for about six out of eight hours. "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination...." Gayheart v. Comm'r of Soc. Sec., 710 F.3d 365, 375 (6th Cir. 2013) (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1)). Here, while Dr. Cylus viewed plaintiff's inability (despite what was noted to be good effort on multiple attempts) to generate sufficient airflow to trigger a DLCO result as inconsistent with her $FEV_1$ and FVC results, and as creating an evidentiary shortfall to plaintiff's detriment, plaintiff persuasively argues that this inability is evidence of the severity of her breathing problems. The functional assessments rendered by Drs. Rhody and Blevins do not differ in any material way. Dr. Blevins based his assessment on the results of his physical examination, a chest x-ray, and a pulmonary function test. While this data was collected during a time when plaintiff was still smoking cigarettes, subsequent test results have confirmed that plaintiff remained just as limited after quitting smoking in April 2011. Dr. Rhody based his assessment on his previous twelve years' experience as plaintiff's treating physician, including his involvement during her multiple hospitalizations for cardiovascular and pulmonary emergencies. The undersigned must conclude that the opinion evidence from the nonexamining state agency consultants is not substantial as compared to the opinion evidence from the examining physicians, and the ALJ's finding to the contrary is unsupported by the record as a whole.

As the Sixth Circuit has explained, the opinion of a treating source such as Dr. Rhody is to be reviewed deferentially:

The Commissioner has elected to impose certain standards on the treatment of medical source evidence. 20 C.F.R. § 404.1502. Under one such standard, commonly called the treating physician rule, the Commissioner has mandated that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527[(c)]. If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527([c])(2)).

Importantly, the Commissioner imposes on its decision makers a clear duty to "always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion." 20 C.F.R. § 404.1527([c])(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996). This requirement is not simply a formality; it is to safeguard the claimant's procedural rights. It is intended "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [ ]he is not." Wilson, 378 F.3d at 544. Significantly, the requirement safeguards a reviewing court's time, as it "permits meaningful" and efficient "review of the ALJ's application of the [treating physician] rule." Id. at 544-45.

Cole v. Astrue, 661 F.3d 931, 937-38 (6th Cir. 2011). In stating merely that "no weight [is given] to Dr. Rhody's opinions since they are inconsistent with his own records, and the overall weight of the evidence in the record" (Tr. 48), without identifying any internal inconsistency in the documentation from Dr. Rhody's office other than certain findings from the two visits in 2012, and without accurately taking account of much of the remaining

24

medical and testimonial record as demonstrated *supra*, the ALJ has plainly failed to give good reasons for his decision to give Dr. Rhody's opinions no weight at all.  But the undersigned finds that the analysis need not have proceeded that far, as Dr. Rhody's opinion that plaintiff cannot perform full-time work -- supported as it is by clinical and laboratory data, and not inconsistent with the other substantial evidence of record -- was due controlling weight.  The undersigned therefore finds that reversal of the ALJ's decision is in order here.

In <u>Faucher v. Sec'y of Health & Human Servs.</u>, 17 F.3d 171 (6th Cir. 1994), the Sixth Circuit Court of Appeals addressed the issue of ". . . what a district court should do once a determination is made that an ALJ erroneously applied the regulations and the [Commissioner]'s denial of benefits therefore must be reversed," concluding that a remand for further fact-finding is appropriate unless ". . . all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."  <u>Id.</u> at 173, 176.  Moreover, the <u>Faucher</u> court stated that

> [W]hen the [Commissioner] misapplies the regulations or when there is not substantial evidence to support one of the ALJ's factual findings and his decision therefore must be reversed, the appropriate remedy is not to award benefits. ...  A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking.

<u>Id.</u> at 175-176 (<u>citing</u> <u>Mowery v. Heckler</u>, 771 F.2d 966, 973 (6th Cir. 1985)).  In this case, there is evidence which demonstrates that plaintiff's symptoms are subject to periods of exacerbation, and that her level of impairment is therefore not constant.  However, even if the record is thus not overwhelmingly in favor of a disability award, the undersigned finds

that the proof of disability is strong, and that evidence that plaintiff could sustain a level of functioning that would allow for work is lacking.  In order to perform substantial gainful activity, one must have the capacity to work on a regular and continuing basis, i.e., eight hours a day, five days a week.  <u>Soc. Sec. Rul. 96-8p</u>, 1996 WL 374184, at *2 (defining "residual functional capacity" in terms of maximum activity sustainable on a regular and continuing basis; "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.").  Even if the nonexamining state agency consultants' opinion that plaintiff could sit for about six out of eight hours were adopted, the record easily supports the notion that plaintiff's combination of physical impairments would not allow her to stand and/or walk for the two remaining hours of the workday.

Accordingly, the undersigned finds that all essential factual issues have been resolved, that remand for further factfinding would be pointless, and that an award of benefits calculated from plaintiff's disability as of July 25, 2010, is in order.

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment be GRANTED and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report, to include an award of benefits.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 18th day of February, 2016.

 s/ John S. Bryant_____
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE